## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                               )
PREVOR,                        )
                               )         Civil Action No. 1:11-cv-01187
                Plaintiff,     )
                               )
        v.                     )
                               )
UNITED STATES FOOD             )
AND DRUG ADMINISTRATION,       )
                               )
                               )
                Defendant.     )
_____)

### PREVOR'S MOTION FOR SUMMARY JUDGMENT

Plaintiff PREVOR, by and through its attorneys, respectfully moves this Court for

an order granting summary judgment pursuant to Fed. R. Civ. P. 56. PREVOR has sued

the U.S. Food and Drug Administration ("FDA"), an agency with delegated authority to

administer the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq*.

FDA wrongly classified Prevor's Diphoterine® Skin Wash ("DSW") product as a

combination product, rather than a device. FDA also wrongly determined that the liquid

component of DSW has a drug mode of action, and that the product should be regulated

as a drug. FDA has violated the FDCA, and has acted arbitrarily, capriciously, contrary

to law, and in excess of statutory authority, in violation of the Administrative Procedure

Act ("APA"), 5 U.S.C. §§ 706(1), 706(2)(A), (C), and (D).

PREVOR seeks an order setting aside FDA's wrongful decisions that DSW is a

combination product, and that the liquid component of DSW has a drug mode of action,

and

      (1) declaring that DSW meets the definition of "device" and is a device under

          21 U.S.C. § 321(h);

      (2) declaring that FDA violated the FDCA in classifying DSW as a

          combination product;

      (3) declaring that FDA illegally failed to initiate rulemaking before imposing

          its novel standard in classifying DSW; and

      (4) declaring that FDA otherwise violated the APA in making its decision on

          DSW.

There is no genuine issue as to any material fact and PREVOR is entitled to judgment as a matter of law as set forth in the Proposed Order. PREVOR is also submitting a Memorandum of Points and Authorities in support of its position, and requests that this Court grant summary judgment in PREVOR's favor.

Dated: November 14, 2011      Respectfully submitted,

                     PREVOR

                     By: __/s/ Anne K. Walsh_____
                         Jeffrey N. Gibbs (D.C. Bar No. 385294)
                         John R. Fleder (D.C. Bar No. 176123)
                         Anne K. Walsh (D.C. Bar No. 464858)
                         Jennifer M. Thomas (D.C. Bar No. 987518)
                         Hyman, Phelps & McNamara, P.C.
                         700 13th Street, N.W., Suite 1200
                         Washington, D.C.  20005
                         Phone:     (202) 737-5600
                         Fax:        (202) 737-9329

                         *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Anne K. Walsh, hereby certify that I caused the forgoing Motion for Summary Judgment and supporting documents to be served via e-mail and the District Court's Electronic Filing System (ECF) upon:

> JOHN W.M. CLAUD
> Trial Attorney
> Consumer Protection Branch
> U.S. Department of Justice
> P.O. Box 386
> Washington D.C. 20044
> *Attorney for Federal Defendant*
>
> CLAUDIA J. ZUCKERMAN
> Senior Counsel
> Office of the Chief Counsel
> Food and Drug Administration
> 10903 New Hampshire Avenue
> White Oak 31, Room 4550
> Silver Spring, MD 20993-0002
> *Of Counsel for Federal Defendant*

This 14th day of November, 2011       __/s/ Anne K. Walsh_____

Anne K. Walsh (D.C. Bar No. 464858)
Hyman, Phelps & McNamara, P.C.
700 13th Street, N.W., Suite 1200
Washington, D.C.  20005
Phone:      (202) 737-5600
Fax:        (202) 737-9329

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PREVOR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:11-cv-01187 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOOD | ) | |
| AND DRUG ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PREVOR'S MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

I.     INTRODUCTORY STATEMENT ......................................................................... 1

II.    STATEMENT OF FACTS ................................................................................... 2

      A.    Product at Issue ...................................................................................... 2

      B.    Framework for Product Classification and Regulation ................................. 4

      C.    FDA's Product Classification of DSW ........................................................ 7

III.   ARGUMENT ................................................................................................... 11

      A.    Summary Judgment Standard................................................................... 11

      B.    FDA Violated the FDCA When it Decided that DSW Is Not a
           Medical Device.......................................................................................... 12

           1.    Under *Chevron I*, FDA's Decision Contravenes the
                 Plain Meaning of the FDCA ............................................................ 12

           2.    Even Under *Chevron II*, FDA's Novel Interpretation of
                 the "Device" Definition Is Not Based on a Permissible
                 Construction of the Statute ............................................................. 16

      C.    FDA Applied An Entirely New Standard for Defining
           "Device" That Did Not Go Through Notice and Comment
           Rulemaking .............................................................................................. 24

      D.    Even if DSW Were a Combination Product, FDA Wrongly
           Decided That DSW Had a Drug Primary Mode of Action ......................... 28

      E.    FDA's Decision Was Otherwise Defective................................................. 34

           1.    FDA Improperly Relied on Documents Outside of the
                 Administrative Proceeding ............................................................... 35

           2.    FDA's Decision Failed to Discuss Crucial Evidence
                 Showing DSW's Primary Mode of Action ...................................... 36

3.     FDA Reviewers Made Serious Errors in Assessing the
       Data Submitted to it, and Failed to Address Other
       Questions or Areas of Concern with Prevor ..................................... 39

IV.   CONCLUSION ...................................................................................................... 41

# TABLE OF AUTHORITIES

## CASES

*A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484 (D.C. Cir. 1995) ............................................ 34

*Actavis Elizabeth LLC v. FDA*, 689 F. Supp. 2d 174 (D.D.C. 2010), *aff'd*, 625 F.3d 760 (D.C. Cir. 2010) ................................................................................................ 12

*American Hospital Ass'n v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987) ................................ 24

*American Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008) .................. 34

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................... 11

*Astoria Fed. Savings & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ............................ 12

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800 (1973) ..................................................................................................... 23

*Bracco Diagnostics v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997) ................................ 23, 24

*Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156 (1962) ................................................ 31

*Catholic Health Initiatives v. Sebelius*, 617 F.3d 490 (D.C. Cir. 2010) ........................... 25

*Checkosky v. SEC*, 139 F.3d 221 (D.C. Cir. 1998) ............................................................ 31

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ......... 12, 16

*Cmty. Nutrition Institute v. Young*, 818 F.2d 943 (D.C. Cir. 1987) ............................ 24, 25

*Cnty. of Los Angeles v. Shala*, 192 F.3d 1005 (D.C. Cir. 1999) ...................................... 35

*Diamond v. Atwood*, 43 F.3d 1538 (D.C. Cir. 1995) ......................................................... 11

*FCC v. Fox Television*, 556 U.S. 502 (2009) ..................................................................... 23

*FDA v. Brown & Williamson*, 529 U.S. 120 (2000) .......................................................... 14

*FDIC v. Meyer*, 510 U.S. 471 (1994) ................................................................................. 13

*Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006) ............................................................. 16

*Hall v. Sebelius*, 770 F. Supp. 2d 61(D.D.C. 2011) .......................................................... 11

*Independent Petroleum Ass'n v. Babbitt*, 92 F.3d 1248 (D.C. Cir. 1996) ........................ 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ......................................................................................... 34, 35, 36

*Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745 (D.C. Cir. 2007) ................... 12

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) ..................................... 15

*Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190 (D.C. Cir. 1984) .............................. 23

*Nutritional Health Alliance v. FDA*, 318 F.3d 92 (2d Cir. 2003) ...................................... 15

*Occidental Petroleum Corp. v. SEC*, 873 F.2d 325 (D.C. Cir. 1989) ............................... 41

*Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997) .............. 25

*Pub. Citizen, Inc. v. Fed. Aviation Admin.,* 988 F.2d 186 (D.C. Cir.1993) ..................... 34

*Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120 (D.C. Cir. 2006) ......................................... 12

*RxUSA Wholesale, Inc. v. HHS*, 467 F. Supp. 2d 285 (E.D.N.Y. 2006) .......................... 16

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ...................................................................... 31

*Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997) ...................................... 24, 26

*Taylor Energy Co. v. U.S. Dept. of the Interior*, 734 F. Supp. 2d 112
   (D.D.C. 2010) ............................................................................................................... 31

*Teva Pharms., USA, Inc. v. Sebelius*, 595 F.3d 1303 (D.C. Cir. 2010)............................ 15

*Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ................................. 19

*U.S. v. Mead Corp.*, 533 U.S. 218 (2001) ........................................................................ 16

*U.S. v. Franck's Lab, Inc.*, 2011 U.S. Dist. LEXIS 102560
   (M.D. Fla. Sept. 12, 2011) ........................................................................................... 25

*U.S. v. Regenerative Scis.*, No. 1:10-cv-01327-RMC (D.D.C.) ................................. 16, 18

## STATUTES

5 U.S.C. §§ 551 *et seq* ........................................................................................................ 2

5 U.S.C. § 553 .................................................................................................................... 25

5 U.S.C. § 706(2)(A), (C), (D) ...................................................................................... 12, 25

21 U.S.C. §§ 301 *et seq* ........................................................................................................ 1

21 U.S.C. §§ 321(g), (h) (1938) ........................................................................................ 17

21 U.S.C. § 321(h)......................................................................................... 1, 5, 13, 42

21 U.S.C. § 321(h) (1976) ................................................................................................. 18

21 U.S.C. § 353(g)......................................................................................................... 6, 13

21 U.S.C. § 353(g)(1) ...................................................................................................... 6, 33

21 U.S.C. § 360(k)............................................................................................................. 35

H.R. Rep. No. 94-853 (1976) .................................................................................. 5, 17, 18

Medical Device Amendments of 1976, Pub. L. No. 94-295, 90 Stat. 539 ........................ 17

## **REGULATIONS**

21 C.F.R. § 3.2 .............................................................................................................. 29

21 C.F.R. § 3.2(f) ........................................................................................................... 25

21 C.F.R. § 3.2(k) ....................................................................................................... 7, 28

21 C.F.R. § 3.2(k)(2) ................................................................................................... 7, 29

21 C.F.R. § 3.2(k)(3) ................................................................................................... 7, 30

21 C.F.R. § 3.2(m) ........................................................................................................... 6

21 C.F.R. § 3.4 ................................................................................................................. 6

21 C.F.R. § 3.4(a) ............................................................................................................ 6

21 C.F.R. § 3.4(a)(1), (2) ............................................................................................... 28

21 C.F.R. § 3.4(b) .......................................................................................................... 32

21 C.F.R. § 3.5 ................................................................................................................. 6

21 C.F.R. § 3.7 ............................................................................................................... 35

21 C.F.R. § 3.7(b) ............................................................................................................ 6

21 C.F.R. § 3.7(c)(3) ...................................................................................................... 32

21 C.F.R. § 10.75 ........................................................................................................... 10

56 Fed. Reg. 14,111 (Apr. 5, 1991) .............................................................................. 30

70 Fed. Reg. 49,848 (Aug. 25, 2005) ......................................................................... 7, 29

71 Fed. Reg. 47,499 (Aug. 17, 2006) ............................................................................ 33

76 Fed. Reg. 36,133 ....................................................................................................... 11

76 Fed. Reg. 45,831 (Aug. 1, 2011) .............................................................................. 27

Fed. R. Civ. P. 56(c) ...................................................................................................... 11

## **OTHER AUTHORITIES**

Attorney General's Manual on APA (1946) .................................................................... 25

International Union of Pure and Applied Chemistry, Compendium of Chemical
  Terminology (v.2.3 2011) ........................................................................................... 39

Joseph A. DiMasi *et al.*, *The price of innovation: new estimates of drug
  development costs*, 22 J. Health Econ. 151 (2003) ..................................................... 27

Josh Makower *et al.*, *FDA Impact on U.S. Medical Technology Innovation: A Survey of Over 200 Medical Technology Companies*.................................................. 27

Joseph A. Mascetta, <u>Barron's Chemistry The Easy Way</u> (1996)...................................... 39

Merriam-Webster's Dictionary ....................................................................................... 13

# I.    INTRODUCTORY STATEMENT

Plaintiff Prevor has filed this action seeking declaratory and injunctive relief against the Defendant, the U.S. Food and Drug Administration ("FDA").  Prevor is seeking summary judgment because there are no genuine issues of material fact in dispute.  Indeed, this case presents a straight-forward question of law that should be resolved in Prevor's favor on summary judgment.

Prevor has developed a product called Diphoterine® Skin Wash ("DSW").  This is an important product that can be safely and effectively used to protect workers against spills of toxic chemicals.

FDA has regulatory jurisdiction over drugs and medical devices.  Congress has carefully delineated the distinction between a drug and a device in the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq*.  As a matter of law, DSW is a device and must be regulated by FDA as such.

The issue here is whether the statute excludes a product from being a device if it has *some* intended chemical action, no matter how minor and secondary it may be to achieving the overall purpose of the product.  The plain language of the statute is not that broad; it only excludes from regulation as a device a product which achieves "its primary intended purposes through chemical action within or on the body of man."  21 U.S.C. § 321(h).  FDA has classified products that have some chemical action, such as DSW, as devices for years.

For Prevor, however, FDA effectively seeks to rewrite the statute.  FDA acknowledged that DSW achieves its primary purpose of washing off and diluting the

chemical on the skin through physical action.  But FDA stated that DSW cannot be a

device because it works "even in part" through chemical action, referring to its secondary

role of neutralizing acids and bases that remain on the skin after its physical washing and

dilution.  FDA's ruling on DSW is inconsistent with the language of the statute and

Congressional intent, as reflected in the statute's legislative history.

Summary judgment also is warranted because FDA's classification of DSW

violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*.  FDA has

reversed the way it regulates products having some chemical action.  This change

required notice and comment rulemaking, which the agency did not do.  Further, FDA's

decision was arbitrary and capricious because the agency's abrupt departure from earlier

policy and precedents was unexplained, and nothing in the record supports it.  Finally, the

agency made scientific errors in the manner in which it analyzed DSW, and failed to

reconcile those errors with information in the record.

## II.     STATEMENT OF FACTS

### A.    Product at Issue

In industrial workplaces, accidental exposure to toxic chemicals through spills or

splashes can cause serious injuries to employees.  Following chemical exposure, there is

usually a delay of several seconds to a few minutes before the offending toxic chemical

penetrates the skin and causes harm.  The standard of care for preventing or minimizing

toxic chemical burn injuries is a water shower, which *physically* removes the toxic

chemical from the worker's skin.  *See* Prevor's Appeal to the Office of Special Medical

Programs ("OSMP Appeal"), Administrative Record ("AR") 728.  When a shower is not

feasible, DSW is an alternative potentially life-saving "first response" to toxic chemical spills in the workplace.  *Id.*  DSW has been safely and effectively used in Europe and several other countries to protect industrial workers.[1]  *Id.*

DSW resembles a paint spray can.  *See* DSW Demonstration Video ("DSW Demo"), AR 765 (CD attached separately).  It consists of a liquid, composed mostly of water, within its own cartridge, all contained inside a canister.  Prevor Request for Designation (Aug. 13, 2009) ("Prevor RFD"), AR 001.   The liquid is odorless, colorless, and approximately 96% water.  *Id.*, AR 003.  The remaining liquid is composed of diphoterine.  *Id.*

A video provided to FDA shows how the product is used.  DSW Demo, AR 765.  After a chemical spill, a response worker activates the canister (*i.e.*, presses the trigger on the nozzle), and the pressurized gas propels the liquid from the canister nozzle directly onto the skin exposed to the toxic chemical spill or splash.  Prevor RFD, AR 003.  The physical impact of the liquid propelled by the canister striking the chemical removes the chemical from the skin; this is a wholly physical effect.  *Id.*; OSMP Appeal, AR 728-730.  Just as is the case with water showers, DSW physically displaces and dilutes the toxic chemical through the addition of water and diphoterine, thus protecting the worker from a severe chemical burn.  Prevor RFD, AR 003; OSMP Appeal, AR 728-730.  DSW also can help to neutralize certain toxic chemicals that might not have been washed off, but

---

[1]      DSW has been marketed outside the U.S. as a device since 1996, and is registered/licensed as a medical device in Europe, Canada, Brazil, and Australia.  OSMP Appeal, AR 728.

this is only a secondary effect of the product.  Prevor RFD, AR 003-004; OSMP Appeal, AR 729.  Data show that this chemical action contributes less than 10% of the therapeutic effect of the liquid, with the mechanical effect of the liquid contributing the remaining approximate 90%.  Prevor RFD, AR 007; OSMP Appeal, AR 730-731.

In terms of classification, DSW is no different than other similar products that contain a solution within a spraying apparatus.  FDA has regulated these earlier products as devices.  OSMP Appeal, AR 731-732; Letter from Prevor to Jill Warner, Acting Associate Commissioner for FDA OSMP (Dec. 2, 2010) ("Prevor 12/2/2010 Letter"), AR 777.  Prevor provided FDA information on several products presenting similar issues of safety and effectiveness, where FDA concluded those products were regulated as devices. OSMP Appeal, AR 731-732; Prevor 12/2/2010 Letter, AR 776-778.

**B.     Framework for Product Classification and Regulation**

The FDCA defines the term "device" to mean:

> [A]n instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is –
>
> > (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,
> >
> > (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
> >
> > (3) intended to affect the structure or any function of the body of man or other animals, and
>
> which does not achieve its primary intended purposes through chemical action within or on the body of man or other

> animals and which is not dependent upon being metabolized
> for the achievement of its primary intended purposes.

21 U.S.C. § 321(h).   The key distinction between a drug and a device is that a device does not achieve "its primary intended purposes through chemical action within or on the body of man."  *Id.*  In amending the "device" definition in 1976, Congress sought both to give FDA enhanced authority over devices, and to draw a clear distinction between a device and a drug because the "[e]xisting statutory definitions of 'device' and 'drug,' although legally mutually exclusive, are functionally overlapping and, thus, confusing to the device industry, the general public and the courts."  H.R. Rep. No. 94-853, at 13 (1976).

Prevor argued to FDA that DSW meets each element of the statutory definition of "device."  Prevor RFD, AR 001.  First, it is not in dispute that DSW is an instrument or apparatus.  Second, it is not in dispute that DSW is intended to prevent and mitigate toxic chemical burns.  OSMP Appeal, AR 728.  Third, it is not in dispute that DSW does not depend on metabolization to achieve its primary intended purpose.

The only issue on which the parties disagree is whether DSW achieves its primary intended purposes through chemical action.  OSMP Appeal, AR 730-731, 733-736. DSW has only one primary intended purpose: to physically wash away and dilute chemical spills or splashes on the skin to prevent and mitigate chemical burns.  *See id.*, AR 728.  DSW operates in the same way as water showers traditionally used to combat chemical burns in that they displace the chemical on the skin (the "washing" effect), which is a physical, not chemical action, and dilute the toxic chemical on the skin, also a

physical, not chemical, action.  *Id.*  DSW meets the last element of the "device" definition because the primary intended purpose of the product is not achieved through chemical action within or on the body.  *See id.*, AR 728-729.

The FDCA acknowledges that some products may constitute a combination of a drug and a device.  These products are deemed "combination products."  21 U.S.C. § 353(g)(1).  If it is in dispute or unclear whether a product meets the statutory definition of "device" or "drug," or if it is a "combination product," the sponsor of the product may submit a Request for Designation ("RFD") to FDA's Office of Combination Products ("OCP") to obtain a determination of the regulatory classification.  21 C.F.R. § 3.7(b).  If FDA determines that the product is a combination product, the agency then decides which Center within FDA has "primary jurisdiction" to review the product based on the information provided by the sponsor.  *See* 21 U.S.C. § 353(g); 21 C.F.R. § 3.4.  The Center for Devices and Radiological Health ("CDRH") has primary jurisdiction over medical devices, and the Center for Drug Evaluation and Research ("CDER") has primary jurisdiction over drugs.  *See* 21 U.S.C. § 353(g)(1); 21 C.F.R. § 3.5.

FDA designates a combination product according to its "primary mode of action" ("PMOA").  21 U.S.C. § 353(g)(1); 21 C.F.R. § 3.4(a).

> *Primary mode of action* is the single mode of action of a combination product that provides the most important therapeutic action of the combination product. The most important therapeutic action is the mode of action expected to make the greatest contribution to the overall intended therapeutic effects of the combination product.

21 C.F.R. § 3.2(m).

6

The agency also defines the terms "mode of action," "device mode of action," and "drug mode of action."  *See* 21 C.F.R. § 3.2(k).   These key terms interpreting FDA's authority to classify combination products were issued pursuant to notice and comment rulemaking.  *See* 70 Fed. Reg. 49,848 (Aug. 25, 2005).

A "mode of action" is "the means by which a product achieves an intended therapeutic effect or action."  21 C.F.R. § 3.2(k).  A constituent part of a combination product has a "*device* mode of action" if it (1) meets the statutory definition of a "device," (2) does not have a biological mode of action, and (3) "does not achieve its primary intended purposes through chemical action . . . ."  21 C.F.R. § 3.2(k)(2).   A constituent part has a "*drug* mode of action" only if it (1) meets the statutory definition of a "drug" and (2) "does not have a biological product or device mode of action."  21 C.F.R. § 3.2(k)(3).  Thus, if a constituent part has a "device mode of action," by definition it cannot have a "drug mode of action."  Prevor argued to FDA that even if DSW is considered to have two component parts, it is a single-entity product, not a combination product, because both the canister and the liquid components have a device mode of action under these definitions.  Prevor RFD, AR 001, 010; OSMP Appeal, AR 734-736.

**C.    FDA's Product Classification of DSW**

On August 13, 2009, Prevor submitted an RFD to OCP showing that DSW meets the statutory definition of a device.  AR 001-010.  In the alternative, Prevor showed that DSW is a single-entity product with both components possessing a device mode of action.  *Id.*

Prevor also argued that even if DSW were a combination product, composed of two constituent parts, the canister and the liquid, it should be regulated as a device because its primary mode of action is that of a device. *Id.*, AR 010. Prevor established, and FDA does not dispute, that the canister has a device mode of action as it produces the physical force by which chemicals on the skin are washed away. *See* Letter from Jill Warner, Acting Associate Commissioner for FDA OSMP (April 25, 2011) ("OSMP Letter"), AR 787. With respect to the liquid, Prevor provided FDA with two *in vitro* studies and a video demonstration of how DSW works to physically displace the spilled or splashed toxic chemical. *See* OSMP Appeal, AR 730-731. Prevor also provided information showing that the liquid can neutralize remaining toxic chemicals, but estimated that this chemical effect is approximately 10% of the therapeutic effect of the liquid. *Id.*

Lastly, Prevor presented information on similar products to DSW in terms of safety and effectiveness that include some percentage of chemical action and that FDA regulates as medical devices. *See id.*, AR 731-732; Prevor 12/2/2010 Letter, AR 776-778. For example:

> Silvaklenz
> - intended for external cleansing of dermal wounds and skin
> - components – pump-spray bottle and aqueous solution
> - primary mode of action – physical: mechanically removes debris from the skin and wound surface
> - secondary mode of action – chemical: assists with cleansing and debridement
>
> RSDL
> - intended to remove or neutralize chemicals from the skin
> - components – lotion and a sponge-like applicator

- primary mode of action – physical: applies the lotion and loosens chemicals by scrubbing
- secondary mode of action – chemical: reacts with and inactivates the chemicals

Prevor RFD, AR 008-009.

On October 16, 2009, in a conclusory three-page letter, FDA provided its summary determination that DSW is not a device. *See* Letter from Thinh Nguyen, Director, FDA Office of Combination Products (Oct. 16, 2009) ("OCP Letter"), AR 675-678. Instead, FDA determined that DSW is a combination product, with the liquid component of DSW a drug and the canister a device. FDA stated:

> The liquid appears to have two primary intended purposes: to wash the chemical off the skin and neutralize the chemical that is on the skin. Since this liquid achieves its primary intended purposes, *at least in part*, through chemical action, it does not meet the definition of device.

OCP Letter, AR 676 (emphasis supplied). FDA then determined—without citing any evidence—that the liquid provides the primary mode of action for DSW, and assigned the product to CDER. *Id.*

OCP's response never addressed the two studies showing that DSW's physical effect greatly outweighed the chemical one. *Id.* Nor did it address the chemical action studies, skin absorption studies, or biocompatibility studies, contained in the RFD. And in dealing with the precedent products described by Prevor, FDA simply asserted that "these products each differ from your product in significant respects, including with regard to intended use, components, and/or ingredients." OCP Letter, AR 676. FDA did not identify what the differences are or how they are "significant."

9

Prevor appealed OCP's decision to the FDA OSMP on March 24, 2010, under the procedure described at 21 C.F.R. § 10.75.  OSMP Appeal, AR 725-770.  Prevor showed that OCP (1) had applied a novel "at least in part" review standard for product classification that is not supported by law or regulation; (2) contradicted established agency precedents; and (3) disregarded information that Prevor provided in its RFD.  *See* AR 725-727.  Prevor again provided information to FDA showing how DSW is actually used on human skin, how it works primarily through physical action, and how similar products have been regulated as devices. *Id.*, AR 728-731; *see* DSW Demo, AR 765. Prevor supplemented this information with six examples of similar products that serve as precedents to DSW.  *See* Prevor 12/2/2010 Letter, AR 771-780; Letter from Prevor to Jill Warner, Acting Associate Commissioner for FDA OSMP (Mar. 24, 2011) ("Prevor 3/24/2011 Letter"), AR 781-783.

On April 25, 2011, more than a year after Prevor submitted its appeal, OSMP classified DSW as a combination product with a drug primary mode of action.  *See* OSMP Letter, AR 784-789.  OSMP's decision reiterated the new and unlawful standard being applied to DSW: "[I]f an article depends, *even in part*, on chemical action within or on the body to achieve any of its primary intended purposes, it does not meet the definition of a device."  *Id.*, AR 786 (emphasis supplied).  Neither the "even in part" language raised by OSMP nor the "at least in part" language used by OCP appears in the statute or FDA's regulations.  FDA improperly and summarily dismissed relevant data and information provided by Prevor without discussion.  *Id.*, AR 784-789.

10

In June 2011, *after* FDA already had applied this new standard to DSW for defining a "device" under the statute, FDA for the first time provided the public with notice that it was changing the rules on product classification.  FDA issued a draft guidance document that articulates a new standard for device classification, with language almost identical to the language FDA used in the earlier DSW decision letters. *See* Draft Guidance for Industry and Food and Drug Administration Staff: Classification of Products as Drugs and Devices and Additional Product Classification Issues, 76 Fed. Reg. 36,133 (June 21, 2011) ("Draft Guidance"), *available at* http://www.fda.gov/RegulatoryInformation/ Guidances/ucm258946.htm.

On June 28, 2011, Prevor filed this suit requesting that the Court vacate or remand FDA's classification determination for DSW.  *See* Complaint ¶ 55.

## III.   ARGUMENT

### A.   Summary Judgment Standard

This Court is familiar with the standards for deciding a motion for summary judgment.  *See Hall v. Sebelius*, 770 F. Supp. 2d 61, 62-63 (D.D.C. 2011).  A court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).

**B.     FDA Violated the FDCA When it Decided that DSW Is Not a Medical Device.**

**1.     Under *Chevron I*, FDA's Decision Contravenes the Plain Meaning of the FDCA.**

FDA acted in excess of its statutory authority, and failed to act in accordance with law, when it misapplied the device definition Congress enacted in the FDCA.  5 U.S.C. § 706(2)(A), (C).  Judicial review of an agency's statutory interpretation follows principles articulated by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  *See Actavis Elizabeth LLC v. FDA*, 689 F. Supp. 2d 174, 177 (D.D.C.), *aff'd*, 625 F.3d 760 (D.C. Cir. 2010); *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007).  The *Chevron* analysis requires that a court first determine whether Congress has "directly spoken to the precise question at issue," looking at the text, purpose, and structure of the statute.  *See Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 124 (D.C. Cir. 2006).  If Congress has so spoken, the court's duty is to give effect to the "unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842-43.  This analysis, when applied to FDA's action here, dictates a finding that FDA violated the FDCA, and thus the APA.

To apply the *Chevron I* analysis, the Court must give effect to every clause and word, and construe the statute "so as to avoid rendering [any statutory language] superfluous."  *See*, *e.g.*, *Astoria Fed. Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (limiting a statutory provision where a broad reading would have left a second provision without effect).  Further, the Court must assume that Congress chose the words

12

in its statutory definition according to their "ordinary or natural meaning." *See FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

The FDCA provides that a device "does not achieve its primary intended purposes through chemical action within or on the body." 21 U.S.C. § 321(h). In classifying DSW, FDA replaced the word "primary" to read "all" or "any," which is contrary to Congress's recognition that a product has certain intended purposes that are more important than others. The word "primary" requires that certain intended purposes are "secondary" or "tertiary," and not to be considered in classifying a device. Any other reading would render the word "primary" superfluous.[2] Had Congress intended to exclude products that achieve "any" intended purpose through chemical action—as FDA is now asserting—Congress would have omitted the word "primary" from the statute.

The plain language of the statute also mandates that DSW is not a combination product, even if viewed as having two separate component parts. Because both component parts (the canister and the liquid) are devices, the product is a "device-device" single-entity product, and thus does not meet the statutory definition of a "combination product."[3] FDA does not dispute that the canister meets the device definition. The liquid

---

[2]     Merriam-Webster's Dictionary defines "primary" as "of first rank, importance, or value." *See* Merriam-Webster Online, *available at* http://www.merriam-webster.com/dictionary/primary.

[3]     The FDCA states that FDA "shall in accordance with this subsection assign an agency center to regulate products that constitute a combination of a drug, device, or biological product." 21 U.S.C. § 353(g). A product that does not combine two different product classifications is not a "combination product."

also meets the device definition.  Its primary intended purpose is to wash off and displace

the toxic chemicals; only about 10% of the product's effect is to chemically neutralize

toxic chemicals that remain on the skin.  *See* Prevor RFD, AR 002.  Indeed, if the

product's primary purpose were to neutralize chemicals on the skin, it would be better

designed in a more concentrated version of the liquid impregnated in a pad applicator,

rather than as a spray.  Moreover, the directions for using DSW require that the user

empty the entire contents of the canister upon use in order to get the full washing and

dilution effects (physical effects).  Prevor RFD, AR 003.  If the neutralization were a

significant effect, users would be instructed to use just enough liquid to neutralize the

spilled or splashed chemical.

Further, FDA is trying to bureaucratically add language to the statute that conflicts

with the statute's plain language.  Instead of reading "achieves its primary intended

purposes through chemical action," FDA has rewritten the clause to read "achieves any of

its intended purposes, at least in part, through chemical action."  *See* OCP Letter, AR

676.  Later, in the OSMP Letter, FDA uses the phrase "even in part" to alter the statutory

language.  AR 786.  In essence, FDA now prevents a device from having even a *de

minimis* chemical effect because the "at least in part" or "even in part" language is so

encompassing.  This erroneous standard led the agency to conclude that DSW is not a

device because it has a secondary chemical effect of neutralizing certain toxic chemicals

remaining on the skin.

Courts have not hesitated to overturn FDA actions where the agency has acted

unlawfully or in excess of its statutory authority.  *See, e.g.*, *FDA v. Brown & Williamson*,

529 U.S. 120 (2000) (overturning FDA's classification of cigarettes and other tobacco products as drugs and devices because FDA's authority was not rooted in the statute); *Teva Pharms., USA, Inc. v. Sebelius*, 595 F.3d 1303, 1315 (D.C. Cir. 2010) (rejecting FDA's argument that the plain language of the statute required FDA's decision, and finding that it conflicted with the structure of the FDCA); *Nutritional Health Alliance v. FDA*, 318 F.3d 92 (2d Cir. 2003) (holding that FDA's requirement of unit-dose packaging for iron-containing dietary supplements was in excess of statutory authority based on the plain language of the FDCA); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1069 (D.C. Cir. 1998) (rejecting FDA's interpretation of the FDCA as "inconsistent with the text and structure of the statute").

　　The record demonstrates that DSW's primary intended purpose is not achieved through chemical action.[4]  Prevor RFD, AR 003-008; OSMP Appeal, AR 728-731; Prevor 12/2/2010 Letter, AR 772-774.  FDA never articulated its basis for finding a secondary intended purpose as "primary."  Rather, the agency simply deemed *all* of DSW's effects as primary intended purposes.   That application directly conflicts with the statutory language.  Giving effect to each word in the statute, as FDA and this Court are required to do, DSW meets the definition of "device."

---

[4]　　Prevor does not dispute that DSW has some chemical action; however, the intended purpose of DSW is the washing off and dilution of the toxic chemicals on the skin, which is achieved by physical, not chemical, action.  *See* Prevor RFD, AR 001.

2. **Even Under *Chevron II*, FDA's Novel Interpretation of the "Device" Definition Is Not Based on a Permissible Construction of the Statute.**

Even if the statute were ambiguous, which it is not, FDA's action cannot withstand scrutiny under the second prong of *Chevron*, which requires that the Court determine if FDA permissibly interpreted the "device" definition in the statute. *Chevron*, 467 U.S. at 843. This Court must consider the intent of Congress in crafting the definition of "device," looking at the words of the statute in context. *See, e.g., Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006).

Agency action merits deference depending on the "degree of the agency's care, its consistency, formality, and relative expertness, and . . . the persuasiveness of the agency's position." *U.S. v. Mead Corp.*, 533 U.S. 218, 228 (2001). There is no deference due to an agency, however, if it interprets the statute inconsistently and fails to adequately explain its departure from prior policy or precedents, like FDA did here. *See id.* at 231-32; *see also RxUSA Wholesale, Inc. v. HHS*, 467 F. Supp. 2d 285 (E.D.N.Y. 2006), *aff'd*, 285 Fed. Appx. 809 (2d Cir. 2008) (finding FDA's regulation inconsistent with the agency's stated position and the twenty-year history of reliance on that position).

a. **FDA's Decision Directly Conflicts with Legislative Intent.**

FDA's "at least in part" or "even in part" statutory construction conflicts with Congress's intent to delineate devices from drugs for purposes of FDA review. This Court has already stated that some language in the "drug" and "device" definitions overlap. *See* Order to Show Cause, *U.S. v. Regenerative Scis.*, No. 1:10-cv-01327-RMC

(D.D.C. Aug. 29, 2011).  Congress specifically carved out a category of products that are

not to be regulated as devices, but this exclusion does not apply to DSW.

Before 1976, the only distinction between a "device" and a "drug" was that the

statute referred to a drug as an "article" and to a device as an "instrument[], apparatus,

contrivance[]. . . ."  *See* 21 U.S.C. §§ 321(g), (h) (1938).  Nevertheless, this distinction

was important because FDA only had authority to review *drugs* for safety and

effectiveness.  *Id.*  Recognizing that the two definitions were "functionally overlapping,"

in the Medical Device Amendments of 1976 ("MDA"), Congress refined the definitions

to "draw a clear distinction between a 'device' and a 'drug.'" [5]  *See* H.R. Rep. No. 94-

---

[5]     The Medical Device Amendments of 1976, Pub. L. No. 94-295, 90 Stat. 539
        (1976), changed the definition of "device" from:

> instruments, apparatus, and contrivances, including their
> components, parts, and accessories, intended (1) for use in the
> diagnosis, cure, mitigation, treatment, or prevention of
> disease in man or other animals; or (2) to affect the structure
> or any function of the body of man or other animals

21 U.S.C. § 321(h) (1970), to:

> an instrument, apparatus, implement, machine, contrivance,
> implant, in vitro reagent, or other similar or related article,
> including any component, part, or accessory, which is –
>     (1) recognized in the official National Formulary, or
>     the United States Pharmacopeia, or any supplement to
>     them,
>     (2) intended for use in the diagnosis of disease or other
>     conditions, or in the cure, mitigation, treatment, or
>     prevention of disease, in man or other animals, or
>     (3) intended to affect the structure or any function of
>     the body of man or other animals, and
> which does not achieve any of its principal intended purposes

853, at 13-14 (1976).  Congress carved out from the "device" definition a product that achieves "any of its principal intended purposes" through chemical action.  21 U.S.C. § 321(h) (1976).

In 1990, Congress again modified the "device" definition – changing the phrase "any of its principal" intended purposes to more narrowly focus only on the product's "primary" intended purposes.   *See* Safe Medical Devices Act of 1990 ("SMDA"), Pub. L. No. 101-629, 104 Stat. 4511 (1990).  There is no evidence that Congress intended to expand FDA's authority over drugs, and the United States does not contest that point in its recent brief filed with this Court.  *See* Government Response to Order to Show Cause, *U.S. v. Regenerative Scis.*, No. 1:10-cv-01327-RMC (D.D.C. Sept. 26, 2011).

FDA's action with regard to DSW is contrary to Congress's intent to define "device" more broadly, and to separate devices from drugs.  In fact it is more consistent with the statutory language in place before 1990, which allowed FDA to consider "any of its principal" intended purposes in classifying a product.   If every intended purpose is called a "primary intended purpose," any product exhibiting even minor chemical action in support of an intended therapeutic effect—like DSW—may be regulated by FDA as a

---

through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of any of its principal intended purposes.

21 U.S.C. § 321(h) (1976).

drug.  Congress's amendment of the device definition in 1990 was designed to avoid that result.

### b.    FDA's Unprecedented Decision Abruptly Diverges from Historical Practice.

FDA changed the rules as applied to DSW without any notice that it would break from years of regulatory decisions treating similar products as devices.  A court should not afford deference to an agency's statutory interpretation that diverges from historical precedent.  *See*, *e.g.*, *Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1010 (D.C. Cir. 1999) (rejecting FDA's interpretation of the FDCA when it was counter to the agency's treatment of other cases, and noting that FDA did not provide any explanation for treating similar cases differently).

FDA regulates as devices those products having a chemical effect that contributes to the primary intended purpose(s).  FDA has generally classified a product as a device when the chemical action cannot achieve the primary intended purpose, but supports the physical action in achieving that purpose.  *See*, *e.g.*, Medical Maggots, RFD 2002.031, AR 097-101.  FDA's new position is that if a product has a chemical effect that contributes "at least in part" or "even in part" to a primary intended purpose, then the product cannot be a device.[6]  Under this reasoning, as every intended purpose is now deemed "primary" by FDA, no chemical contribution to an intended use is permitted at

---

[6]      FDA is authorized to change its position, but it must do so as discussed in Section III.C., in accordance with requisite procedural safeguards when that change amounts to a substantive rulemaking.

all for a product to be a device. Until issuing its Draft Guidance in July, FDA had never

publicly taken that position.[7]

Prevor provided FDA with information concerning several historical precedents.

A product that is extremely similar to DSW is Reactive Skin Decontamination Lotion

("RSDL"), which FDA recently cleared for marketing as a device. RSDL is "intended to

remove or neutralize chemical warfare agents and T-2 toxin from the skin," and consists

of a lotion pre-impregnated in a foam sponge applicator pad. *See* RSDL 510(k)

Summary, AR 171-175. Just like DSW, RSDL physically removes chemicals (in this

case, chemical warfare agents and T-2 toxin) as its primary intended purpose. *See* Prevor

RFD, AR 009. Just like DSW, RSDL achieves neutralization of the toxin through

chemical action. Despite its chemical activity, RSDL is regulated as a device.

FDA's different classification of DSW represents a major change from the

analysis it undertook for RSDL. Indeed, it is the opinion of at least two FDA reviewers

in this very case that RSDL, and its predecessor product, M291, should have been

classified and would be classified differently if these same submissions were received by

FDA today. *See* Memorandum from Sheila Murphey, CDRH Infection Control Devices

Branch (Sept. 3, 2009) ("Murphey Memo"), AR 057-058 (stating that RSDL and M291

would "now" be considered to have a chemical PMOA rather than physical);

Memorandum from Joseph Milone (CDRH) (Sept. 1, 2009) ("Milone Memo"), AR 046,

---

[7]     FDA had articulated this new position, now erected into a new standard, in its
        OCP Letter with regard to DSW, AR 675-677, but did not publicly "propose" the
        change for another 19 months.

20

048-049 (same).  These products have not changed, and the law has not changed.  Only FDA's standard for classifying devices has changed.  Yet FDA never acknowledged that change—the true basis for its determination on DSW—in either the OCP Letter or the OSMP Letter.

FDA's action on DSW also is inconsistent with decisions it has taken on similar products since then.  Just months *after* ruling on DSW, on February 2, 2011, FDA cleared NasalCEASE® for marketing as a device.  *See* Prevor 03/24/2011 Letter, AR 781-782; NasalCEASE® 510(k) Summary, *available at* http://www.accessdata.fda.gov/ cdrh_docs/pdf10/K102742.pdf.   NasalCEASE® consists of calcium alginate nasal packing "intended to be inserted into the anterior nasal cavity to stop minor nosebleeds." *See id*. Like DSW, the primary effect of NasalCEASE® is physical – it exerts a compressive force to stop bleeding.  Also like DSW, NasalCEASE® has a secondary chemical effect because the calcium in the product acts as a blood coagulant though chemical activity.  Indeed, DSW has less of a chemical interaction with the body than does NasalCEASE®.  Prevor 03/24/2011 Letter, AR 782.

Prevor also provided information to FDA about Dermacyn Wound Cleanser, which FDA found to be a device.[8]   Prevor RFD, AR 008; Prevor 12/2/2010 Letter, AR 775-778 (describing similarities between precedents and DSW).  Dermacyn is intended to

---

[8]     Additional information about Dermacyn is available in its RFD (2004.066), http://www.fda.gov/downloads/CombinationProducts/JurisdictionalInformation/R FDJurisdictionalDecisions/RedactedDecisionLetters/UCM113796.pdf, and 510(k) summary (K042729), http://www.accessdata.fda.gov/cdrh_docs/pdf4/K042729. pdf.

"moisten[] and debrid[e] acute and chronic dermal lesions." *See id.* It consists of a saline solution provided in a spray bottle with a trigger. FDA regulates Dermacyn as a device because its primary action is to move liquid across the wound, despite its secondary dissolution effect. *See id.*

Yet another example of FDA's reversal is its past decision to classify medical maggots as devices. Medical maggots are intended to debride non-healing skin and soft tissue wounds. *See* OSMP Appeal, AR 769. Medical maggots work by secreting proteolytic enzymes (a chemical effect), but they are not therapeutically effective without the rasping and tearing of necrotic tissue (a physical effect). *Id.*, AR 770. Thus, FDA recognized that "the proteolytic enzymes [chemical action] appear to aid in debridement secondarily to the maggots' physical rasping action," and concluded that the physical debriding effect was the primary intended purpose of the product. *Id.* Like medical maggots, DSW's neutralizing effect is a secondary supporting action to its physical washing and dilution action. *See id.*, AR 741-742.

In sum, FDA has without explanation applied to Prevor a new standard for classifying products that rests on a new interpretation of "device," notwithstanding that its actions conflict with earlier classification decisions and with the statutory language. The industry has relied on the agency's previous classification decisions. Even FDA acknowledges the import of its earlier designation decisions, and publishes them on its website to foster "greater predictability and consistency of decisions, and decrease ambiguity and uncertainty about FDA perspectives." *See* RFD Jurisdictional Decisions, *available at*

http://www.fda.gov/CombinationProducts/JurisdictionalInformation/RFDJurisdictionalD ecisions/default.htm.

FDA's new statutory interpretation results in a jurisdictional overhaul of products that have been historically regulated by FDA as devices, without any meaningful prior notice or explanation. *See FCC v. Fox Television*, 556 U.S. 502 (2009) ("[T]he requirement that an agency provide reasoned explanation . . . would ordinarily demand that it display awareness that it is changing position.  An agency may not, for example, depart from a prior policy *sub silentio* . . . and of course the agency must show that there are good reasons for the new policy.").

Courts strike down an agency action if it represents an unexplained departure from the agency's prior policies and precedents.  *See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 807-08 (1973); *Bracco Diagnostics v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997) (when a product meets the definition of a drug and a device under the FDCA, "[w]hat the FDA is not free to do, however, is to treat them dissimilarly and to permit two sets of similar products to run down two separate tracks, one more treacherous than the other, for no apparent reason").

FDA's decision represents disparate treatment of similar products.  *See Bracco Diagnostics*, 963 F. Supp. at 28; *see also Independent Petroleum Ass'n v. Babbitt*, 92 F.3d 1248, 1258-60 (D.C. Cir. 1996) ("An agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.") (citing *Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1201 (D.C. Cir. 1984).  FDA's decision letters do not provide a legitimate reason for failing to treat Prevor in a similar manner to

23

historical precedent, all of which are regulated by the agency as devices under a much less onerous review standard.

In *Bracco*, the court prohibited FDA from regulating certain injectable contrast imaging agents as drugs and others as devices. 963 F. Supp. at 28. FDA is trying to do that same thing again here. FDA similarly ignored the precedents Prevor cited in support of regulating DSW as a device, many of which FDA's own reviewers acknowledge as presenting similar issues of safety and effectiveness. FDA's reasoning for rejecting the precedents cited by Prevor is at best perfunctory and conclusory.

In truth, FDA has simply decided that it will not respect its own precedents in making new classification determinations, as the agency stated outright in its recent Draft Guidance: "In reviewing [] an RFD, OCP may determine that, in light of current scientific understanding, the means by which such a product or constituent part achieves an intended use may warrant a different classification . . . than the agency previously provided." *See* Draft Guidance at 6, *available at* http://www.fda.gov/RegulatoryInformation/Guidances/ucm258946.htm.

## C.    FDA Applied An Entirely New Standard for Defining "Device" That Did Not Go Through Notice and Comment Rulemaking.

The courts have long recognized that an agency policy creating new rights or duties is a "substantive" rule that requires notice and comment rulemaking. *See Cmty. Nutrition Institute v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987); *American Hospital Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (stating that substantive rules are alternately called "legislative" rules); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C.

24

Cir. 1997) (holding that FDA's "notice" stating that positron emission tomography (PET) radiopharmaceuticals should be regulated as drugs required notice and comment rulemaking); *see also* APA, 5 U.S.C. §§ 553, 706(2)(D); Attorney General's Manual on APA (1946). A substantive rule is one that is binding on the agency itself and imposes new regulatory obligations on the regulated industry. *See Cmty. Nutrition*, 818 F.2d at 945-946 (ruling that FDA's "nonbinding statements of agency enforcement policy" was actually a legislative rule subject to notice and comment requirements); *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010).

"Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 585-86 (D.C. Cir. 1997). As a federal district court recently held in striking down FDA's efforts to change its policy on pharmacy compounding without appropriate notice and comment: "The FDA cannot simply upset the expectations it helped create through decades [] without explanation." *U.S. v. Franck's Lab, Inc*., 2011 U.S. Dist. LEXIS 102560, at *33 (M.D. Fla. Sept. 12, 2011) (notice of appeal filed Nov. 10, 2011). In applying a new standard to classify DSW, FDA changed its long-standing policy and its interpretation of its own regulations. This change required notice and comment rulemaking, and FDA's failure to follow the appropriate procedure violated the APA.

For at least 20 years, FDA has applied a consistent statutory interpretation of the term "device." FDA's regulations define "device" using only the statutory language. *See* 21 C.F.R. § 3.2(f) (stating that the term "device" has "the meaning given the term in

section 201(h) of the act").  In classifying DSW, however, FDA arbitrarily and without

reason strayed from its long-standing position, and imposed a novel and different

standard than it had ever imposed on any other product, without modifying its regulation.

FDA intends to bind itself to this new standard.  *See Syncor Int'l Corp.,* 127 F.3d

at 94 ("The primary distinction between a substantive rule – really any rule – and a

general statement of policy, then, turns on whether an agency intends to bind itself to a

particular legal position.").  Shortly after it applied this new standard to DSW, FDA

issued a draft guidance document articulating to the public – for the first time – the

"current thinking" of the agency.  *See* Draft Guidance at 2, *available at*

http://www.regulations.gov/#!documentDetail;D=FDA-2011-D-0429-0002.  FDA's

proposal via Guidance mirrors exactly the language used by OSMP in classifying DSW:

> [A] product that depends, ***even in part***, on chemical action within or
> on the body of man to achieve ***any one*** of its primary intended
> purposes, would not be a device.  In addition, if a product has
> multiple therapeutic effects, ***each of these*** would be a "primary
> intended purpose" of the product.

Draft Guidance, at 5 (emphasis supplied).

FDA imposed its new guidance on Prevor *prior* to its publication, *prior* to any

public comment, and *prior* to the issuance of guidance in its final form.  All of the

comments to the Draft Guidance regulatory docket that deal with this issue object to

FDA's new classification standard, and all view this as a change in FDA's long-standing

practice of classifying products that have some chemical effect as devices.  *See*

Comments to FDA Docket No. 2011-D-0429, *available at*

http://www.regulations.gov/#!docketDetail;dct=FR%252BPR%252BN%252BO%252BS
R%252BPS;rpp=10;po=0;D=FDA-2011-D-0429.

Another reason FDA's new standard amounts to a substantive rule is that it imposes new regulatory obligations through an entirely different regulatory scheme. For Prevor this change is dramatic and costly. For example, if DSW is regulated as a drug, Prevor would pay FDA approximately $1,621,450 more for review as a new drug than as a device.[9] That, however, is only a small fraction of the increased cost. A study published by Tufts University in 2002 estimates that the average pre-tax out-of-pocket costs of obtaining FDA approval are $403 million per new drug.[10] In contrast, a 2004 Stanford survey suggests the estimated cost of obtaining FDA approval or clearance to market a new device ranges from $31-94 million.[11]

---

[9]     The fees paid by a sponsor for the pre-market review of a device can range from $4,049 to $220,050, depending on whether the device is reviewed for approval or clearance via a Pre-Marketing Application or a 510(k) pre-marketing notification. *See* FDA Website: How to Market Your Device, *available at* http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarke tYourDevice/default.htm. In sharp contrast, the premarketing review fee associated with a New Drug Application was $1,841,500 in fiscal year 2012. *See* Prescription Drug User Fee Rates for Fiscal Year 2012, 76 Fed. Reg. 45,831, 45,837 (Aug. 1, 2011).

[10]    *See* Joseph A. DiMasi *et al.*, *The price of innovation: new estimates of drug development costs*, 22 J. Health Econ. 151, 166 (2003).

[11]    *See* Josh Makower *et al.*, *FDA Impact on U.S. Medical Technology Innovation: A Survey of Over 200 Medical Technology Companies*, available at http://www.advamed.org/NR/rdonlyres/040E6C33-380B-4F6B-AB58-9AB1C0A7A3CF/0/makowerreportfinal.pdf.

27

**D.    Even if DSW Were a Combination Product, FDA Wrongly Decided
That DSW Had a Drug Primary Mode of Action.**

By definition, a combination product has multiple modes of action: "Because
combination products are comprised of more than one type of regulated article (biological
product, device, or drug), and each constituent part contributes a biological product,
device, or drug mode of action, combination products will typically have more than one
identifiable mode of action." 21 C.F.R. § 3.2(k). A combination product's primary mode
of action controls which part of FDA has jurisdiction over its premarket review and
regulation: If the PMOA is that of a device, then CDRH "shall" have primary
jurisdiction; if the PMOA is that of a drug, then CDER "shall" have primary jurisdiction.
21 C.F.R. § 3.4(a)(1), (2).

FDA has clearly defined all these terms:

> (k) *Mode of action* is the means by which a product achieves
> an intended therapeutic effect or action. For purposes of this
> definition, ''therapeutic'' action or effect includes any effect
> or action of the combination product intended to diagnose,
> cure, mitigate, treat, or prevent disease, or affect the structure
> or any function of the body.
> * * *
>       (2) A constituent part has a device mode of action if it
> meets the definition of device contained in section 201(h)(1)
> to (h)(3) of the act, it does not have a biological product mode
> of action, and it does not achieve its primary intended
> purposes through chemical action within or on the body of
> man or other animals and is not dependent upon being
> metabolized for the achievement of its primary intended
> purposes.
>       (3) A constituent part has a drug mode of action if it
> meets the definition of drug contained in section 201(g)(1) of

the act and it does not have a biological product or device mode of action.

(m) *Primary mode of action* is the single mode of action of a combination product that provides the most important therapeutic action of the combination product. The most important therapeutic action is the mode of action expected to make the greatest contribution to the overall intended therapeutic effects of the combination product.

21 C.F.R. § 3.2; *see also* Definition of Primary Mode of Action of a Combination Product, 70 Fed. Reg. 49,848 (Aug. 25, 2005).  There is no ambiguity in the above definitions, and FDA has applied them consistently for years until it received the RFD for DSW.

If DSW were evaluated as a combination product, which it is not, the agency's own regulatory parameters dictate that DSW's PMOA would be that of a device, putting primary review authority with CDRH.  It is undisputed that the canister component of DSW has a device mode of action.  The liquid component also has a device mode of action under the regulatory definition.

Indeed, Prevor remains baffled how FDA determined that the liquid component of DSW has a drug mode of action when the administrative record shows otherwise. Pursuant to the regulations discussed above, the liquid 1) meets the statutory definition of "device"; 2) does not have a biological product mode of action; 3) does not achieve its primary intended purposes through chemical action within or on the body of man; and 4) is not dependent upon being metabolized to achieve its primary intended purposes.  *See* 21 C.F.R. § 3.2(k)(2); Prevor RFD, AR 002-008.  Thus, it has a device mode of action.

29

In addition, the liquid does *not* meet the requirements of having a drug mode of action. 21 C.F.R. § 3.2(k)(3) (stating that a constituent part has a drug mode of action only if it does not also have a device mode of action).   So FDA's conclusion is simply inconsistent with the plain language in the regulation.   Further, even "if a product is a combination of a drug and a device [. . .] and the drug functions to enhance the device effect, the product will be regulated as a device."  Notice, The Safe Medical Devices Act of 1990, 56 Fed. Reg. 14,111, 14,112 (Apr. 5, 1991).  With both components of DSW having a device mode of action, the only outcome is that DSW's PMOA is that of a device.

FDA's regulations provide that if it is not certain which components provides the primary mode of action, then the Center with the most experience should regulate the product.  21 C.F.R. § 3.4(b).  For DSW, that would be CDRH, not CDER ("CDER").   As shown above, CDRH has considerable experience in reviewing products like DSW. Conversely, CDER's expertise lies in regulating products that act by chemical means, not a fluid administered by a spray that functions primarily by washing the chemical through mechanical means.

Furthermore, even if the liquid were a drug, FDA provided no reasonable explanation for why the "combination product" should be a drug.  The force imparted by the nozzle provides the impetus to remove the chemical.  *See* DSW Demo, AR 765. FDA's decision did not explain why between the nozzle and the liquid, the liquid provided the primary mode of action.  *See* OCP Letter, AR 675-677; OSMP Letter, AR 784-789.

No deference to an agency's interpretation of its own regulations is warranted where the agency's opinion "yields no clear and coherent standard," since a court "cannot defer to an agency when [it is] at a loss to know what kind of standard [the agency] is applying or how it is applying that standard to [the] record." *Checkosky v. SEC*, 139 F.3d 221, 225 (D.C. Cir. 1998). In this case, FDA provided only a summary explanation of why it determined that the product's primary mode of action was that of a drug. The data in the record show that the product's washing effect is the primary purpose of the product, and that the chemical neutralization is merely secondary. FDA failed to provide any data or citation to support its decision to the contrary. *See* DSW Demo, AR 765; Prevor RFD, AR 005-008. Without any information in FDA's final decision letters,[12] Prevor, and this Court, are left to guess why FDA reached its conclusion.

As discussed in Section III.B.2 above, courts must treat similar products similarly. Prevor provided FDA with examples of several products similar to DSW that FDA has regulated as devices. FDA summarily dismisses these products as different from DSW "in significant respects." AR 676. But these products are all the same as DSW in the

---

[12]    In reviewing agency action, a court must rely on the "basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 169 (1962); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943); *Taylor Energy Co. v. U.S. Dept. of the Interior*, 734 F. Supp. 2d 112, 119 (D.D.C. 2010) (finding that an agency decision was arbitrary and capricious because the agency had mischaracterized an element of the administrative record in stating the grounds for its decision).

most salient aspect of all: a chemical action contributes to one of the intended purposes of the product.

Even if DSW were considered a combination product, rather than a single-entity product, significant precedent exists warranting its regulation as a device.  Indeed, in certain situations, FDA's regulations require that it consider precedent in determining how to regulate a combination product.

> In some situations, it is not possible to determine, with reasonable certainty, which one mode of action will provide a greater contribution than any other mode of action to the overall therapeutic effects of the combination product.  In such a case, the agency will assign the combination product to the agency component that regulates other combination products that present similar questions of safety and effectiveness with regard to the combination product as a whole.  When there are no other combination products that present similar questions of safety and effectiveness with regard to the combination product as a whole, the agency will assign the combination product to the agency component with the most expertise related to the most significant safety and effectiveness questions presented by the combination product.

21 C.F.R. § 3.4(b).  FDA even asks that the sponsor provide information related to "other combination products the sponsor wishes FDA to consider during the assignment of its combination product."  21 C.F.R. § 3.7(c)(3).  Prevor provided this information to FDA in its RFD.

Heparin catheter lock-flush systems, for example, consist of a solution that contains the anticoagulant heparin.  OSMP Appeal, AR 738-739.  The solution exerts pressure on a patient's circulating blood, and the heparin in the solution prevents blood clotting through chemical action.  The agency originally regulated this product as a drug,

but re-designated it as a device, even while explicitly acknowledging that it works in part

through a chemical action. *Id.* FDA explained that the primary mode of action in

maintaining catheter potency was attributable to the physical occupation of space and the

application of pressure within the catheter, and that "the drug component of the product

(heparin) performs a secondary role by acting chemically . . . ." *See id.*; *see also* Heparin

Catheter Lock-Flush Solutions: Transfer of Primary Responsibility from Center for Drug

Evaluation and Research to Center for Devices and Radiological Health, 71 Fed. Reg.

47,499, 47,500 (Aug. 17, 2006).

Silvaklenz is another example of a combination product with a device PMOA. *See*

Prevor RFD, AR 008; Prevor 12/2/2010 Letter, AR 775-78. Silvaklenz is a compound of

a solution supplied in a pump-spray bottle.[13] It is intended for external cleansing of

dermal wounds and skin. Despite Silvaklenz's antimicrobial action, a chemical effect,

FDA regulated it as a device because its primary mode of action is to remove debris,

necrotic tissue, and foreign particles from the skin and wound surface. *See id.*

FDA's failure to regulate DSW and these similar products in a similar manner is

illogical. Even FDA's internal review acknowledges that DSW is similar to these other

products, determined to be devices outright, or combination products with a device

PMOA. *See, e.g.*, Milone Memo, AR 045-049. This Court should find that FDA acted

---

[13]     Additional information about Silvaklenz is available in its RFD (2006.067),
         http://www.fda.gov/downloads/CombinationProducts/JurisdictionalInformation/R
         FDJurisdictionalDecisions/RedactedDecisionLetters/UCM113805.pdf, and 510(k)
         summary (K03069), http://www.accessdata.fda.gov/cdrh_docs/pdf6/K063069.pdf.

arbitrarily and capriciously when it failed to treat DSW consistent with the statute,

regulations, and established precedent.

**E.     FDA's Decision Was Otherwise Defective**

Even if FDA's application of the new standard for defining "device" was

procedurally valid, which it was not, and even if the agency had correctly applied its own

regulations, which it did not, the administrative record demonstrates that FDA's decision

was arbitrary and capricious because the record does not support the decision it made

here.  An agency action is arbitrary and capricious if the agency:

> relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of
> the problem, offered an explanation for its decision that runs
> counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in
> view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983);

*American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008) (holding

that a mere conclusory statement could not "substitute for a reasoned explanation"); *A.L.*

*Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491-92 (D.C. Cir. 1995) (FDA's conclusory

response was not sufficient to enable the court to reach an independent conclusion that

the agency's decision was the product of reasoned decision making).   Courts require that

an agency demonstrate that it "examine[d] the relevant data and [can] articulate a

satisfactory explanation for its action including a 'rational connection between the facts

found and the choice made.'"  *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43; *see also Pub.*

*Citizen, Inc. v. Fed. Aviation Admin.,* 988 F.2d 186, 197 (D.C. Cir.1993) ("The

requirement that agency action not be arbitrary or capricious includes a requirement that

the agency adequately explain its result."). "Where the agency has failed to provide a

reasoned explanation, or where the record belies the agency's conclusion, [the court]

must undo its action." *County of Los Angeles v. Shalala,* 192 F.3d 1005, 1021 (D.C. Cir.

1999) (internal citations omitted).

### 1.    FDA Improperly Relied on Documents Outside of the Administrative Proceeding.

FDA's action with regard to DSW was wrong because it improperly relied on

information that *was not* properly before the agency in the classification proceeding, and

failed to consider important information and data that *were* part of the administrative

record and relevant to the decision at issue. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at

43 (1983).

It was critical to DSW's classification that FDA properly identify the product's

"primary intended purposes." FDA acknowledges that "[a] different jurisdictional

determination may be appropriate if there is a change in intended use . . . ." OCP Letter,

AR 675. FDA, however, improperly considered information from Prevor's earlier

510(k) notice, which predated, was irrelevant to, and was entirely separate from, Prevor's

RFD proceeding. The submission of an RFD under 21 C.F.R. § 3.7 initiates a separate

FDA regulatory process from a premarketing notification, under 21 U.S.C. § 360(k).

In Prevor's 510(k) submission, Prevor described DSW's intended purpose as

follows: "Diphoterine® Skin Wash is intended to remove and/or neutralize corrosive and

irritant industrial chemicals from the skin." The 510(k) regulatory proceeding ended on

October 30, 2008, when FDA notified Prevor it was denying its premarketing

submission.  In its later RFD submission, Prevor revised its intended purposes for DSW

to: "(1) remove splashes of acidic or basic substances off the skin by physically and

mechanically washing the chemicals away from the skin, and (2) neutralize and dilute

acids and bases." [14]  Prevor RFD, AR 002.

     Despite this clear statement, FDA reviewers wrongly relied on the outdated

statements of the "intended uses" in Prevor's 510(k).  *See, e.g.*, Murphey Memo, AR 054

("When K082903 was submitted for review to CDRH in October, 2008, the Indication

for Use statement said that 'Diphoterine Skin Wash is intended to remove and/or

neutralize corrosive and irritant industrial chemicals from the skin").   In addition, FDA

included Prevor's 510(k) as part of the administrative record in this case, which

evidences FDA's reliance on this extra-proceeding material.  *See* AR 110-674.  FDA's

reliance on statements from Prevor's 510(k) supports the conclusion that FDA's decision

was arbitrary and capricious.

   **2.    FDA's Decision Failed to Discuss Crucial Evidence Showing
          DSW's Primary Mode of Action.**

     On the other hand, the agency action cannot pass arbitrary and capricious review if

the record shows that it failed to consider material information and data.  *See Motor*

*Vehicles Mfrs. Ass'n,* 463 U.S. at 43.  FDA reviewers concluded that "the primary mode

---

[14]     Applicants often revise their proposed intended use during the review of the
        application, or in submitting a new application after one has been rejected.  The
        product's purpose is determined by the pending statement of intended use, not any
        previous statements.

of action is the physical removal of the offending acid or base, by spraying the DSW

solution under pressure, in the same way that showers and eye-washing devices are used

in laboratories and similar settings."  *See* Memorandum from John Kelsey, CDER Dental

Team Leader, to Ayoub Suliman, CDER Product Jurisdiction Officer 4 (Sept. 10, 2009)

("Kelsey Memo"), AR 065.  The recommendation from CDER was that the product does

*not* "meet criteria for review as a drug product."  Kelsey Memo, AR 064.  FDA's two

decisions never articulated the basis for its opposite finding, not even to contradict its

employees' contrary conclusions.

The FDA did not address in the OCP Letter the two studies demonstrating the

effects of DSW's liquid component.  Only in the OSMP Letter does FDA state *in a*

*footnote*:

> These studies are flawed because they do not simulate the
> conditions of use and therefore do not appear to measure or
> reflect the actions of the solution on the body.  Further, the
> lack of a control in the 'neutralization' study makes it
> difficult to draw any conclusions from this study.

*See* OSMP Letter, AR 786.  This short footnote was the first time FDA ever articulated a

concern surrounding these studies, despite its prior communications with Prevor on this

very issue.[15] Thus, Prevor was deprived of an opportunity to respond to these assertions, and FDA deprived of the opportunity to understand Prevor's response.[16]

Further, FDA failed to address several other key points made by Prevor, including:

1)    directions showing that the entire contents of the container must be applied to the affected skin or DSW may not be effective;

2)    information about the diphoterine molecule having to remain in solution for it to exhibit any chemical activity, showing that the product in finished, final form is the mode of action;

3)    evidence that the dilution effect is marginal *because of* the rapidity of the mechanical effect;

4)    similarities between DSW and water showers in the workplace;

5)    evidence that, absent the primary physical mode of action, one would need to apply a very large amount of DSW on the affected skin to minimize the harmful effects of a chemical splash;

6)    information from the visual demonstration of the use of DSW; and

7)    studies related to the chemical action, skin absorption, and biocompatibility of DSW.

FDA's failure to adequately consider data that was central to its decision renders its decision arbitrary and capricious.

---

[15]    *See* OCP Request to Prevor for Additional Information (Aug. 18, 2009), AR 015-016, Prevor Response to Request for Additional Information (Aug. 19, 2009), AR 017-022, Prevor Letter Following Up to Sept. 16, 2010 Meeting With OSMP (Dec. 2, 2010), Prevor Second Letter Following Up to Sept. 16, 2010 Meeting With OSMP (Mar. 24, 2011).

[16]    The administrative record also is devoid of minutes from any of the meetings or telephone calls in which Prevor provided, and FDA discussed, substantive information.

3.     **FDA Reviewers Made Serious Errors in Assessing the Data
       Submitted to it, and Failed to Address Other Questions or Areas
       of Concern with Prevor.**

The internal memoranda of FDA employees who did *not* decide this matter, which

were first provided to Prevor once it initiated this case, are replete with faulty

assumptions and factual errors.  For example:

- FDA reviewers rejected the precedents Prevor cited based on an incorrect

  assumption that DSW only works on water-soluble acids and bases.  *See*

  Milone Memo, AR 045-046.   DSW is approved in Europe for use on non

  water-soluble chemical spills and splashes.  *See* European Labeling for

  DSW, *available at* http://www.prevor.com/EN/sante/RisqueChimique/

  materiel/media/Mode_emploi/Mode_d_emploi__DAP25062008_EN.pdf.

- FDA reviewers incorrectly found that DSW has a chemical effect because

  it mistakenly conflated the separate actions of dilution, which DSW does,

  and dissolution/solubilization,[17] which DSW does not do.  *See* Milone

  Memo, AR 044, 051.   It is basic chemistry that a chemical effect is one in

  which an action results in a reaction, like dissolution of salt into water.[18]

  DSW does not dissolve or solubilize chemicals,[19] which would be

---

[17]     "Solubilization" is short for "micellar solubilization."  *See* International Union of
Pure and Applied Chemistry, Compendium of Chemical Terminology at 924 (v.
2.3 2011), *available at* http://goldbook.iupac.org/PDF/goldbook.pdf.

[18]     *See* Joseph A. Mascetta, Barron's Chemistry The Easy Way 2-3 (1996).

[19]     The CDER Product Jurisdiction Officer recognized that "the use of water as a

chemical effects, and there is no evidence in the record to support FDA's statements to the contrary.

- FDA reviewers also inaccurately concluded DSW has a chemical effect because it considered the water in DSW to have a chemical "neutralizing" effect. *See* Milone Memo, AR 041-043.  As Prevor squarely addressed in data provided to FDA, water physically dilutes acids and bases, but it does not chemically neutralize them.  Indeed, if FDA were correct that water involves a chemical neutralization, then FDA should be regulating as drugs water showers used to mitigate and prevent chemical burns.

- FDA failed to accept the studies submitted by Prevor, and accepted other studies, without any evidence in the record showing why Prevor's studies were not acceptable.  *See* Milone Memo, AR 039-041.

These errors and inconsistencies are evidence of a defective FDA process.  Prevor could have addressed these issues had FDA reviewers asked these questions or at least identified them in its classification decision.  As it was, there was no discussion on these issues despite numerous communications between Prevor and FDA.[20]  Because these

---

solvent for the diphoterine, in and of itself, should not be viewed as a mode of action."  *See* E-mail from Ayoub Suliman, CDER Product Jurisdiction Officer, to John Weiner, FDA Office of Combination Products 1 (Sept. 16, 2009) ("Suliman E-mail"), AR 060.

[20]  In several locations, FDA reviewers complain of having insufficient data or information, either on DSW, or on the precedents in support of classification of DSW as a device. *See* Milone Memo, AR 046, 048; Murphey Memo, AR 057; Suliman E-mail, AR 060.  However, it appears that no effort was made to obtain

issues were not communicated to Prevor, Prevor did not have an opportunity to address them on appeal. An agency determination that affects a party's interests should not rest "on a ground of which [that party] had no prior notice and to which it had had no opportunity to respond." *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 342 (D.C. Cir. 1989). Moreover, FDA's decisions do not mention these errors. Prevor and the Court are left to guess regarding whether the FDA adopted, rejected, or even considered these matters.

## IV.   CONCLUSION

In classifying DSW as a combination product and designating CDER as the FDA Center with primary jurisdiction, FDA has relied upon a new regulatory interpretation of the statutory definition of "device" that is in direct conflict with the unambiguous statutory language. FDA's novel interpretation is an impermissible construction of the statute. It also is inconsistent with Congressional intent and is an abrupt and unexplained departure from FDA's prior policy. Moreover, FDA's imposition of a new "device" definition, and thus a new standard for product classification, is a rule that may only be promulgated through notice and comment rulemaking under the APA. Since FDA failed to promulgate its new standard through the required legal process, the standard is invalid.

In addition to the above, FDA's actions with respect to DSW do not reflect reasoned agency decision-making. In fact, the agency acted in violation of its own

_____

additional data from Prevor or from the agency's own files.

unambiguous regulations, and has disregarded both prior precedent and the facts of the matter at issue in this case.

In view of the above, we respectfully request that this Court: (1) set aside FDA's determination that DSW is a combination product; (2) set aside FDA's decision that the liquid component of DSW has a drug mode of action; (3) declare that DSW meets the definition of "device" and is a device under 21 U.S.C. § 321(h); (4) declare that FDA violated the FDCA in classifying DSW as a combination product; (5) declare that FDA illegally failed to initiate rulemaking before imposing its novel standard in classifying DSW; and (6) declare that FDA otherwise violated the APA in making its decision on DSW.

Dated:  November 14, 2011                    Respectfully submitted,

                                             PREVOR


                               By:   ____/s/ Anne K. Walsh_____
                                     Jeffrey N. Gibbs (D.C. Bar No. 385294)
                                     John R. Fleder (D.C. Bar No. 176123)
                                     Anne K. Walsh (D.C. Bar No. 464858)
                                     Jennifer M. Thomas (D.C. Bar No. 987518)
                                     Hyman, Phelps & McNamara, P.C.
                                     700 13th Street, N.W., Suite 1200
                                     Washington, D.C.  20005
                                     Phone:    (202) 737-5600
                                     Fax:      (202) 737-9329

                                     *Attorneys for Plaintiff*